UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROMEO LAND DEVELOPMENT
LLC,                                                Plaintiff,

                                                                        DECISION AND ORDER

-vs-                                                                  11-CV-6516 CJS

CVS PHARMACY, INC.,

                                                    Defendant.


_____

INTRODUCTION

This is an action for breach of contract between a commercial land developer, Romeo
Land Development, LLC ("Romeo" or "Plaintiff"), and a well-known retail pharmacy chain,
CVS Pharmacy, Inc. ("CVS" or "Defendant").  Now before the Court is CVS's motion (Docket
No. [#14]) to dismiss the Amended Complaint's first and third causes of action for failure to
state a claim, or, in the alternative, for partial summary judgment on those claims.[1]  The
motion to dismiss is granted as to the first cause of action and denied as to the third cause
of action.

BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint in this
action, including the underlying contractual documents which are incorporated by reference.
It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited as to what
it can consider. *See, Vasquez v. City of New York*, No. 10 Civ. 6277(LBS), 2012 WL
4377774 at *1 (S.D.N.Y. Sep.24, 2012). (On a 12(b)(6) motion, "a court may consider
'documents attached to the complaint as an exhibit or incorporated in it by reference, ...
matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession
or of which plaintiffs had knowledge and relied on in bringing suit.' " *Chambers v. Time*

---

[1]As discussed further below, the Amended Complaint purports to state three separate claims
for breach of contract.  Defendant's motion is not directed at the second cause of action.

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (*quoting Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).").

In this action, the parties have each submitted matters outside of the pleadings, in the form of affidavits, and Defendant has moved, in the alternative, for partial summary judgment.  The affidavits add little to the pleading and the documents incorporated therein by reference.  Essentially, Defendant's short affidavit, consisting of seven paragraphs, contends that Plaintiff failed to satisfy contractual conditions precedent regarding each of the two development sites that are at issue in this motion. *See*, Angella Franklin Aff. at ¶ ¶ 6-7.  Specifically, Defendant contends that Plaintiff failed to obtain approvals from the CVS Real Estate Committee, failed to execute Development Contract Supplements, and failed to complete the projects.[2]  Plaintiff submitted a much-lengthier affidavit, which, for the most part, merely repeats the allegations in the Amended Complaint. *See*, Frank Romeo Aff. Additionally, Plaintiff's affidavit agrees that the contractual conditions precedent were not performed, but maintains that was Defendant's fault. *Id*. at ¶ ¶ 55-58.

In this situation, where the parties have submitted matters outside of the pleadings, the Court may treat the motion as one for summary judgment:

> Rule 12(d) of the Federal Rules of Civil Procedure provides, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Accordingly, a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule requires that the court give "sufficient notice to an opposing party and an opportunity for that party to respond." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir.1995).

Ordinarily, formal notice is not required where a party "should reasonably have

---

[2]With regard to the Titus Avenue site, Defendant further indicates that, after CVS took over the site from Plaintiff, it never completed the project, and it "became a dead  deal." *Id*. at ¶ 7.

recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings." *Villante v. Dep't of Corrections of City of New York*, 786 F.2d 516, 521 (2d Cir.1986) (internal quotation marks omitted) (*quoting In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir.1985)).

*Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009).

Plaintiff, despite having submitted an affidavit concerning matters outside the pleadings, nevertheless contends that Defendant's summary judgment motion is premature, since the parties have not had an opportunity to conduct discovery. On that point, it is true that it is "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (citations omitted). Ordinarily, however, to avoid summary judgment, the nonmoving party must submit an affidavit or declaration explaining what discovery he needs, and how such discovery will create a triable issue of fact. *See*, FRCP 56(d) (Formerly 56(f), requiring the nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion); *see also, Young v. Benjamin Dev. Inc.*, No. 09–1320–cv, 395 Fed.Appx. 721, 722–723, 2010 WL 3860498 (2d Cir. Oct.5, 2010) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery. Nonetheless, we conclude that the district court committed no error in this case because Young failed to file an affidavit setting forth the essential facts he sought to discover.") (citation omitted); *Crandall v. David*, No. 10–0985–cv, 2012 WL 255329 at *1 (2d Cir. Jan.30, 2012) ("We review a district court's denial of a motion for further discovery under Fed.R.Civ.P. 56(d) for an 'abuse of discretion' and will not reverse where a plaintiff has failed to show how the facts sought are reasonably expected to create a genuine issue of material fact.") (citations and internal quotation marks omitted).

Here, Plaintiff has not submitted a Rule 56(d) affidavit, but instead has included, in

its memorandum of law, a rather vague discussion as to why discovery is necessary. Nonetheless, the Court will exercise its discretion to postpone summary judgment motions until after the parties have had an opportunity to conduct discovery. Accordingly, the Court will not consider anything besides the Amended Complaint and the documents incorporated into it by reference, although, it appears the Court would reach the same ultimate result either way.

With that issue resolved, the Court will proceed to set forth the relevant facts, viewed in the light most-favorable to Plaintiff. CVS is a Rhode Island corporation with a principal place of business in Rhode Island. Romeo  is a commercial real estate developer in Rochester, New York. In or about 2006, Romeo began working with CVS to identify properties that would be desirable for new pharmacy locations. Romeo showed CVS numerous locations, but with specific reference to this motion, Romeo identified two locations: Brockport, New York ("the Brockport Site"); and Titus Avenue in Rochester ("the Titus Site").

On May 23, 2008, the parties entered into a contract, titled a Preferred Developer Agreement ("PDA"). On January 2, 2009, the parties executed an Amended PDA. The PDA, as amended, deals with essentially two broad matters:  1) the identification of sites for potential pharmacies; and 2) the development of those sites. More specifically, the pertinent provisions of the PDA, as amended, are as follows:

> [1(a)] Developer shall work with CVS to identify sites for consideration by CVS for new CVS  retail pharmacy stores[.] . . .  In addition, with CVS's prior written approval and on terms and conditions as agreed upon with CVS . . . Developer shall develop approved sites as new retail pharmacy stores for CVS[.]
>
> ***
>
> [1(b)] Notwithstanding Developer's designation as the CVS Preferred Developer for the Territory [Rochester], CVS reserves the right, in its sole discretion, to lease projects, to acquire store locations, or to consider and/or accept any other real estate acquisition, leasing and/or development transaction within the territory from other parties that do not have CVS

Preferred Developer status[.] Accordingly, Developer acknowledges that while it has been designated as a CVS Preferred Developer for the Territory, it has not been designated as an exclusive developer for CVS in the Territory and nothing in this agreement should be taken to suggest any exclusivity in favor of developer.

***

[1(d)] The parties acknowledge that Developer's designation as a CVS Preferred Developer does not constitute an agreement by CVS to lease any project, to acquire any store location, to participate in a specific number of projects or transactions with Developer, or to engage in any transaction with Developer. The parties further acknowledge that (i) final site selection shall remain solely within the discretion of CVS; and (ii) all aspects of the acquisition, design, development and leasing of any store for or by CVS shall be subject to CVS's prior approval in its sole discretion.

***

3. <u>Developer Compensation</u>. Developer and CVS expect that, as a CVS Preferred Developer, Developer shall propose a number of projects to CVS for consideration by CVS in each calendar year, which CVS in its sole discretion shall be free to accept or reject.

(a) Developer and CVS agree that for all of the projects completed for CVS by Developer under the CVS Preferred Developer Program, Developer shall be compensated solely on a fixed fee-for-service basis per project as provided in the applicable documents and agreements between CVS and Developer with respect to each specific project. . . . As of the date hereof, the fee per project with respect to all projects approved by the CVS Real Estate Committee on or after January 2, 2009, is:

(i) Fee Simple Land Acquisitions: $235,000.00 (75% paid at land closing provided all permits for the project have been issued, 15% paid upon issuance of permanent certificate of occupancy and 10% paid upon full completion of the project and satisfaction of all Conditions Precedent to Final Disbursement).

(ii) Ground Leases: $210,000.00 (75% paid at land possession, 15% paid upon issuance of permanent certificate of occupancy and 10% paid upon full completion of the project and satisfaction of all Conditions Precedent to Final Distribution).

***

5

(d) Full completion of the project shall have been deemed to have occurred at such time as Full Completion of the Project shall have occurred as defined in the Development Contract or Master Development Contract applicable to the project [.]

***

6. <u>Termination</u>

This Agreement shall be at will between the Parties.  This Agreement shall remain in effect, unless terminated by either Party in the manner set forth below.

(a) Developer may withdraw from the CVS Preferred Developer Program at any time upon written notice to CVS of such withdrawal. . . . .

(b) CVS may withdraw Developer's status as a CVS Preferred Developer at any time upon written notice to Developer of such withdrawal.  . . . .

(c) Any such termination shall not affect any project the terms of which have been reduced to written agreement between Developer and CVS or any Affiliate.

***

8. <u>General</u>

(a) It is understood and agreed that following notification to Developer that a proposed project pro forma has been approved by CVS, CVS will be responsible for funding the itemized project costs set forth on such pro forma ... provided that CVS shall have no responsibility to Developer for any expenses, losses or actions incurred or undertaken by Developer as a result of work performed or materials or equipment purchased by Developer prior to such notification, unless specifically agreed to in writing by CVS.

***

(c) This Agreement may not be amended or modified except by an instrument in writing signed by the Parties hereto.

***

(h) This Agreement and the rights and obligations of the Parties hereunder shall be construed in accordance with and governed by the law of the State of Rhode Island[.][3]

---

[3]Preferred Developer Agreement dated May 23, 2008, as amended.

Notably, the PDA indicated, in two separate paragraphs, that it represented "the agreement of the parties with respect to Developer's Compensation for all such *projects approved by the CVS Real Estate Committee* on or after January 2, 2009." Amendment Agreement dated January 2, 2009 at pp. 1, 3 (emphasis added).  The Amended Complaint also indicates that the compensation schedule pertained to "projects *that were completed* which [Romeo] undertook for CVS." Amended Complaint at ¶ 9 (emphasis added).

However, the PDA is not the only agreement between the parties dealing with compensation.  On January 2, 2009, the parties also executed a Master Development Contract ("MDC"), pertaining to those situations, referenced earlier, in which CVS might request that Romeo develop a site.  The MDC purports to set forth general terms regarding the development of sites, while leaving the details of specific projects to be set forth in separate Development Contract Supplements ("DC Supplements"). The MDC further indicates that DC Supplements would not be executed for a particular project  until "immediately following the CVS Real Estate Committee's approval of the Project."

The MDC also provides procedures for situations in which CVS might elect to "take over" a project from a developer, such as occurred in the instant case at the Titus Site. Specifically, Article 29 of  the Master Development Contract states:

> CVS, after prior notice to [Romeo] in accordance with the terms of this Contract, may complete all or any portion of the Work, and in the event [Romeo] has failed or neglected to prosecute the Work properly hereunder, shall have failed to perform any provisions herein, or an Event of Default shall have occurred hereunder such action shall be without prejudice to any other remedy that may exist, and the cost to correct any such deficiencies may be deducted from any unpaid portion of the Development Fee or shall be paid by [Romeo] to CVS upon demand.  <u>In the event CVS exercises such option the Development Fee shall be reduced to reflect the portion of the Work that was unfinished at the time CVS exercised its option to complete the Work.</u>
>
> As to each Project, in the event CVS exercises such option prior to the closing with respect to the acquisition of the Land, CVS shall reimburse [Romeo] for all out-of-pocket due diligence expenses incurred by [Romeo] and any other

reimbursements due hereunder and approved by CVS in accordance with the provisions of this Contract.

As to each Project, <u>if CVS exercises such option after the Land Closing, in addition to the foregoing due diligence reimbursement and any other reimbursements due hereunder and approved by CVS in accordance with the provisions of this Contract</u>, so long as [Romeo] has not failed or neglected to prosecute the work properly hereunder, shall not have failed to perform any provision herein and there has been no Event of Default by [Romeo] hereunder, <u>CVS shall pay [Romeo's] Compensation to [Romeo] upon satisfaction of [Romeo's] obligations hereunder, other than those obligations with respect to completion of the Project</u>, after the date of such exercise.

MDC Art. 29 (emphasis added).

Additionally, Article 49 of the MDC, entitled "Abandonment of Project," states, in pertinent part:

[Romeo] hereby agrees and acknowledges that CVS shall have the right, in its sole and absolute discretion, to determine not to proceed with the construction of any Project at any time.

As to each Project, in the event CVS determines not to proceed with the construction of the Project prior to the closing with respect to the acquisition of the Land, CVS shall reimburse Developer for all out-of-pocket due diligence expenses incurred by [Romeo] and any other reimbursements due hereunder and approved by CVS in accordance with the provisions of this Contract.  In such event, no Development Fee shall be paid to [Romeo] with respect to such Project.

As to each Project, if CVS determines not to proceed after the Land closing, in addition to the foregoing due diligence reimbursement, and any other reimbursements due hereunder and approved by CVS in accordance with the provisions of this Contract, so long as [Romeo] has not failed or neglected to prosecute the work properly hereunder, shall not have failed to perform any provision herein and there has been no Event of Default by Developer hereunder, CVS shall pay [Romeo's] Compensation for the Project in question to [Romeo] reduced to reflect the portion of the Work that was unfinished at the time CVS exercised its option to abandon such Project, upon satisfaction

of [Romeo's] obligations hereunder other than with respect to completion of such Project, after the date of CVS's determination.

MDC Art. 49.

Finally, Article 45 of the MDC states that "[a]ny notice, consents or other communications" given under the contract are to be made in writing, and delivered by either mail, courier or fax.  However, the Article concludes by stating: "Authorizations and consents required to be given in writing may be given by e-mail."  Moreover, Section 8(d) of the PDA, which pertains to giving notices, includes Romeo's email address. *See*, PDA at p. 7.

Pursuant to the PDA, Romeo took certain actions with regard to the aforementioned sites.   With regard to the Brockport Site, Romeo showed the location to CVS executives, and "researched and gathered demographic, zoning and other pertinent information regarding" the site. Amended Complaint ¶ 14.  In turn, CVS advised Romeo that it was interested in the site, and CVS's Real Estate Director for the Rochester area, Angella Franklin ("Franklin"), directed Romeo to "proceed with efforts to acquire and develop" the site. Amended Complaint ¶ 17.  In May 2009, Romeo made a purchase offer on the site. However, the property owner did not accept the offer, and informed Romeo that he already "had a better offer from another person to develop a CVS." Amended Complaint, Ex. B. Romeo informed Franklin of that fact by email, which he closed by stating, "Let me know how hard you want me to pursue this." Amended Complaint, Ex. B.

Apparently, the third party who had made the other offer to the Brockport Site's owner was already known to both Romeo and Franklin, since Franklin immediately responded to Romeo's email and stated, in pertinent part: "Walk away for now.  I will stand my ground that the only way this deal will get done is if it is done as a purchase with you.  Sooooo [sic] he really does not have a deal.  *What offer did Gata [sic] make?"* Amended Complaint Ex. B. In that regard, Franklin was referring to Calvin Gaeta ("Gaeta"), of Genesee Regional Properties, LLC, who, as it turned out, had offered to develop the Brockport Site for CVS as a turn-key lease.

Despite Franklin's statement that she would stand her ground, CVS nevertheless went with Gaeta, and completed the transaction with him, instead of Romeo.  According to Romeo, Franklin later indicated that "she was able to obtain better terms through [Gaeta]." Amended Complaint ¶ 29.  As a consequence of CVS's selection of Gaeta to develop the Brockport site, Romeo did not receive compensation for its preliminary work on the site.[4]

Concerning the Titus Site, beginning in 2007, Romeo showed the property to CVS and "researched and gathered demographic, zoning and other pertinent information regarding the [site]." Amended Complaint ¶ 59.  At CVS's direction, Romeo also successfully negotiated a ground lease for the property.  On February 26, 2009, CVS closed the lease with the owner of the Titus Site.[5]  Additionally, Romeo prepared a site plan and began negotiating with the Town of Irondequoit for approval of the site plan.

On October 20, 2009, CVS informed Romeo that it was withdrawing Romeo's status as  Preferred Developer, effective November 1, 2009.  However, CVS directed Romeo to complete projects that were "the subject of an executed Development Contract, *and* to proceed, subject to direction and approval by CVS, with the following Projects: CS 47918-Titus & Cooper Roads, Rochester, NY (the Titus Site) and CS 51735, Winton and Blossom, Rochester, NY (the Winton Site)." Amended Complaint ¶ 12.  From that statement in the pleading, the Court understands that neither the Titus nor the Winton sites were yet the subject of an executed Development Contract, but that CVS nevertheless wanted Romeo to continue working on them.

However, on February 15, 2010, Franklin sent an email to Romeo, indicating that CVD would be "taking over the [Titus] project[.]" Amended Complaint ¶ 64.  Franklin stated,

---

[4]Romeo contends that by electing to proceed with a different developer, CVS "avoided having to pay [Romeo] any amounts due under the Preferred Developer Agreement." Frank Romeo Aff., ¶ 19. Presumably, however, CVS paid compensation to the other developer. Accordingly, to the extent Romeo suggests that by switching developers CVS completely avoided paying a developer, the Court does not agree that would be a reasonable inference to be drawn. *See*, Frank Romeo Aff. ¶ 40.

[5]See, Frank Romeo Aff. at ¶ 23.

though, that she would ask CVS to compensate Romeo $100,000.00 for the work that it had already done on the project, provided that Romeo would work with CVS to coordinate any further meetings with the property owner that might be needed. Amended Complaint, Ex. E.  However, CVS ultimately did not pay Romeo for the Titus Site.

On October 18, 2011, Romeo commenced this action.  On April 9, 2012, Romeo filed an Amended Complaint [#13], which purports to assert three separate causes of action for breach of contract, two of which involve the Brockport Site and Titus Site, respectively. Concerning the Brockport Site, the pleading alleges that CVS "breached the Preferred Developer Agreement, including [the] obligation of good faith," by "secretly compet[ing] with Romeo for the Brockport Site through the other developer [Gaeta]." Amended Complaint ¶ 32.  In Romeo's view, CVS should not have pursued the deal with Gaeta, since Romeo "identified the Brockport Site, did preliminary work to show it was a prime candidate, and negotiated for its acquisition." Amended Complaint ¶ 32.  Romeo therefore maintains that it is owed $210,000.00 by CVS, which is the amount that would have been owing if Romeo had completed a ground lease for CVS at the Brockport Site.

Concerning the Titus Site, the Amended Complaint alleges that CVS breached the Preferred Developer Agreement and the Master Development Contract by "taking over" the development of the site and failing to pay Romeo.  The pleading further indicates that CVS breached "Articles 29 and 45 of the Master Development Contract," by failing to provide "written notice of CVS's intent to take over development of the Titus Site." Amended Complaint ¶ 68.  Romeo therefore maintains that it is owed $210,000.00 by CVS under the aforementioned compensation schedule, since Romeo completed a ground lease for the Titus Site.

With regard to both sites, Romeo maintains that to the extent it failed to perform any necessary conditions precedent to payment under the agreement, it was prevented from doing so by CVS.

On May 7, 2012, Defendant filed the subject motion [#14] to dismiss or, alternatively,

for summary judgment. With regard to the Brockport claim, CVS denies that the Amended Complaint states an actionable claim, since the parties' agreement gave CVS complete discretion over whether to utilize Romeo's services on any particular project.  With regard to the Titus Site, CVS maintains that the pleading fails to state an actionable claim, since the necessary conditions precedent to payment never occurred.  In that regard, CVS maintains that Romeo never completed the project, CVS's Real Estate Committee never voted to approve the project, and the parties never executed a specific DC Supplement for the site.  For those same reasons, CVS maintains that the MDC does not apply to the Titus Site.

## DISCUSSION

The general legal principles concerning motions under FRCP 12(b)(6) are well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

First, although a court must accept as true all of the allegations contained in a complaint,[6] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).  "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Management Inc.*,  712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

There is no dispute that the Court must apply Rhode Island law in evaluating the sufficiency of Romeo's contract claims.  Romeo maintains that CVS breached the implied covenant of good faith.  Under Rhode Island law, it is well settled that "there is an implied covenant of good faith and fair dealing between parties to a contract so that the contractual objectives may be achieved." *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643, 645 (R.I. 1972).

> The covenant of good faith is regarded as a counterpromise that the promisee will act in a manner consistent with the purposes of the contract. . . .  [A] party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith.  A party's actions, however, do not violate the covenant of good faith and fair dealing

---

[6]The Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. den.* 531 U.S. 1052, 121 S.Ct. 657 (2000).

when they were contemplated by the parties at the time of contract formation.

*Hord Corp. v. Polymer Research Corp. of America*, 275 F.Supp.2d 229, 237-238 (D.R.I. 2003) (citations omitted).  In that regard, "[a]n unambiguous contractual clause, agreed upon by both parties, cannot be rendered meaningless, because one party does not like its strict application." *Id*., 275 F.Supp.2d at 238 (citation omitted); *see also, id*. ("Since plaintiff acted within the confines of the parties' contractual objectives, and thus by definition in good faith, plaintiff did not violate the implied covenant of good faith and fair dealing.").

"The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F.Supp.2d 317, 329 (D.R.I. 1999).

In cases such as this one, where the contract affords the alleged breaching party considerable discretion,

> there appears to be consistent recognition in commercial and banking jurisprudence that "[g]ood faith between contracting parties requires the party vested with contractual discretion to exercise it reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Carrico v. Delp*, 141 Ill.App.3d 684, 690, 490 N.E.2d 972, 976 (1986).  Furthermore, <u>exercise of a discretionary right under an agreement when used as a pretext for an effort to gain an improper advantage, or to thwart the reasonable expectations of the parties</u> may also constitute a breach of the implied covenant of good faith and fair dealing. *See Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 473, 583 N.E.2d 806, 820 (1991); Southwest Sav. & Loan Ass'n v. Sunamp Sys., Inc., 172 Ariz. 553, 559, 838 P.2d 1314, 1320 (1992).  Merely because a party reserves the right to take action under a particular set of circumstances does not mean that there can never be a breach of the implied covenant, even if the discretion is exercised arbitrarily, by improper means, or for an improper purpose.

*Gillette of Kingston, Inc. v. Bank Rhode Island*, No. WC 05-0616, 2006 WL 1314259 at *6 (R.I.Super. 2006) (emphasis added; in a case involving a breach of contract under Rhode

Island law).

Specifically in the context of a motion to dismiss for failure to state a claim under FRCP 12(b)(6),

> [t]o state a claim for breach of the implied covenant of good faith and fair dealing, a party must do more than allege a simple breach of contract. . . .  [A] party generally must allege some kind of "subterfuge[ ]" or "evasion[ ]," such as "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance." Restatement (Second) of Contracts § 205 (1981).

*Dotcom Associates I, LLC v. United States*, 112 Fed.Cl. 594, 596 (Fed.Cl. 2013).  That is, the plaintiff must "*allege . . . facts* that would show that [the defendant] exercised such discretion arbitrarily, irrationally or in bad faith." *See, Sveaas v. Christie's Inc.*, No. 11-2064-cv, 452 Fed.Appx. 63, 2011 WL 6415192 (2d Cir. Dec. 22, 2011) (emphasis added).

### The Brockport Site

As already mentioned, Romeo maintains that "CVS breached the Preferred Developer Agreement, including its obligation of good faith, by utilizing the Other Developer to complete the project." Amended Complaint ¶ 32.  Although Romeo contends that on this point, the agreement is "clear," Pl. Memo of Law [#19] at pp. 7-8,  significantly, Romeo does not allege that CVS breached any particular express contractual provision.  Instead, Romeo admits that, under the Preferred Developer Agreement, it was not an exclusive developer, and that CVS had "sole discretion" to enter into deals with other developers.  Consequently, Romeo seems to maintain that the implied covenant of good faith did not allow CVS to utilize another developer once Romeo was already involved with a property. *See*, Pl. Memo of Law [#19] at p. 8.  With respect to such arguments, the pleading contends that CVS should have allowed Romeo a further  "opportunity to freely engage in negotiations with the owner." Amended Complaint ¶ 30.

In Romeo's memo of law submitted in opposition to the motion to dismiss, it further

explains the basis of the Brockport claim as follows:

> Plaintiff identified the Site[ ] for Defendant, engaged in significant legwork, invested time and effort in procuring the site[ ] and then was told by [CVS] to 'walk away,' only to find out later that CVS was using the information [Romeo] had provided and [also] using [another] developer for the site[ ].

Pl. Memo of Law [#19] at p. 2.  However, the Amended Complaint does not actually allege that CVS used any information from Romeo in making a deal with Gaeta.  In fact, the complaint does not allege that Romeo gave CVS any particular information about the site, other than the name of the owner's attorney.  Rather, the complaint indicates that the owner of the Brockport site already had a "better" offer from Gaeta "to develop a CVS" when Romeo submitted its purchase offer.[7]

Considering the pertinent allegations, the Court finds that the Amended Complaint fails to state a claim for breach of contract concerning the Brockport site.  As already discussed, the Preferred Developer Agreement  gave CVS essentially unlimited discretion about how to acquire its properties, while simultaneously emphasizing that Romeo had no reasonable expectation of exclusivity.  Consequently, CVS was entitled to do business with Gaeta rather than Romeo, and was not required to allow Romeo the opportunity to continue negotiating with the owner.

Romeo nevertheless maintains that while the agreement gave CVS broad discretion, CVS exercised that discretion in an arbitrary and unreasonable manner that violated the agreement's implied covenant of good faith, since it frustrated Romeo's objective in entering the agreement. Romeo contends that CVS did so by "secretly" working with Gaeta, after Franklin assured Romeo that she would "stand her ground" and insist that CVS use Romeo as the developer.  Romeo further suggests that CVS was motivated by a desire to "evade paying Plaintiff the compensation due [to him]." Pl. Memo of Law [#19] at p. 2.  However, the

---

[7]The Amended Complaint indicates that Romeo was pursuing that project as a "fee simple land acquisition."  The pleading further indicates that such "better offer" was made by Gaeta, and involved a different type of project, namely, a lease. Amended Complaint ¶ 28.

Case 6:11-cv-06516-CJS-MWP   Document 30   Filed 05/14/14   Page 17 of 19

Court does not agree that those allegations state a plausible claim for breach of the covenant of good faith.  In that regard, there is  no suggestion that Franklin had the authority to amend the PDA, so to the extent that she may have suggested that Romeo had some entitlement to continue working on the project, her statement was contrary to the specific terms of the agreement.  Similarly, the fact that CVS failed to tell Romeo that it was pursuing a deal with Gaeta is not indicative of bad faith, since CVS was free to do business with whomever it chose, and Romeo had no reasonable expectation of exclusivity.  In any event, Romeo was already aware, from speaking with the site owner's attorney, that Gaeta had made a better offer "to develop a CVS."  Moreover, Franklin's statement that she would "stand her ground" alerted Romeo to the possibility that, while Franklin claimed to support Romeo, others within CVS's corporate hierarchy might disagree with her.  As it turned out, Franklin was apparently overruled both as to who would develop the site (Romeo vs. Gaeta), and how it would be developed (lease vs. purchase).

Finally, although Romeo suggests, in conclusory fashion, that CVS was motivated by a desire to "evade paying [Romeo]," no such inference can be reasonably drawn from the pleading.  In that regard, the Amended Complaint does not plead any facts which reasonably suggest that CVS realized a financial windfall from doing business with Gaeta as opposed to Romeo.[8]  To the contrary, the pleading merely indicates that CVS wanted the property, and that Gaeta had already made an offer that was viewed by the owner as being more favorable to him than Romeo's offer.  The fact that CVS exercised its discretion to enter a deal with Gaeta rather than Romeo does not suggest that CVS acted in bad faith or that it was motivated by a desire to deny Romeo the benefits of the Preferred Developer

---

[8]The Amended Complaint indicates only that Franklin claimed "she was able to obtain better terms through [Gaeta]." Amended Complaint at ¶ 29. The pleading further suggests that if Romeo had been given the chance, it might have also negotiated with the site owner for "such terms." *Id*.  The pleading does not explain how the deal with Gaeta involved "better terms," though the obvious possibility is that CVS viewed a turn-key lease as being more desirable than purchasing the property. *See, id*. at ¶ 33 ("Plaintiff was ready, willing and able to acquire the Brockport Site, construct the Store, and if necessary enter into a build-to suit/turnkey lease with CVS.").

Agreement.  For all these reasons, Romeo's cause of action concerning the Brockport Site is dismissed for failure to state a claim.

### The Titus Site

Romeo maintains that CVS breached the Preferred Developer Agreement, including the implied covenant of good faith, by "taking over" the development of the site, "instead of continuing to work with [Romeo]," and by failing to give proper written notice under Articles 29 and 45 of the Master Development Contract.  Amended Complaint ¶ ¶ 67-69. Additionally, Romeo contends that CVS breached the Preferred Developer Agreement "by failing to pay [Romeo] the amount due[.]"  *Id*. at ¶ 69. With regard to the allegation that CVS improperly "took over" the site, the Amended Complaint does not allege that CVS violated any particular express term of the agreement, apart from failing to give proper notice under Articles 29 and 45 of the Master Development Contract by failing to provide written notice. Nor does the Amended Complaint identify the specific contractual provision that would warrant payment where, as here, CVS took over the site.  However, from the Court's recitation of the facts, the reasonable inference is that Romeo is relying on the PDA's "Developer Compensation" provision, as amended, which, in conjunction with Article 29 of the MDC, appears to provide for partial compensation in situations where CVS has taken over a project.

CVS counters that the Amended Complaint fails to state a plausible claim as to the Titus Site, since the necessary conditions precedent never occurred, and that the MDC therefore does not apply.  However, the Court disagrees.  In that regard,  the  Amended Complaint clearly indicates that CVS gave its approval to have Romeo develop site, and to continue developing it even after CVS withdrew Romeo's Preferred Developer Status. Additionally, Romeo successfully obtained a ground lease on CVS's behalf, and performed significant additional work on the site, before CVS announced that it was taking over the site.

Accordingly, it appears that MDC Article 29 applies.[9]  CVS contends that the extent of Romeo's work on the site is irrelevant, since CVS's Real Estate Committee never approved the project and the parties never executed a DC Supplement.  The Amended Complaint, though, indicates that CVS had control over those factors, and unreasonably prevented those conditions precedent from occurring.  The Amended Complaint further indicates that regardless of whether certain formalities were observed, CVS in fact approved having Romeo develop the Titus Site, up until the time it gave notice it was taking over the site. Accordingly, the Amended Complaint plausibly states a claim for breach of contract regarding the Titus Site.

CONCLUSION

Defendants' motion [#14] to dismiss is granted as to the Amended Complaint's first cause of action (the Brockport Site) and denied as to the third cause of action (the Titus Site).

So Ordered.

Dated: Rochester, New York
      May 13, 2014              ENTER:


                       /s/ Charles J. Siragusa
                       CHARLES J. SIRAGUSA
                       United States District Judge

---

[9]CVS maintains that after it took over the project, it abandoned it.  Even if that is true, it appears that Romeo would be entitled to compensation under Article 49 of the MDC.